IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 18-cv-02329-PAB-MEH

ERIK M. UNDERWOOD, a Colorado citizen, and
MY24HOURNEWS.COM, INC., a Colorado corporation,

    Plaintiffs,

v.

BANK OF AMERICA CORPORATION, a Delaware corporation,

    Defendant.

---

# ORDER

---

This matter comes before the Court on Plaintiff's Motion and Memorandum of Law Pursuant to Fed. R. Civ. P. 65 [Docket No. 7]. The Court has jurisdiction pursuant to 28 U.S.C. § 1331.

## I. BACKGROUND

Plaintiffs Erik M. Underwood and My24HourNews.com, Inc. filed this action on September 11, 2018. Docket No. 1. Plaintiffs assert five claims for relief: (1) false association under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); (2) common law service mark infringement; (3) common law unfair competition; (4) unfair or deceptive trade practice under the Colorado Consumer Protection Act, Colo. Rev. Stat. § 6-1-101 *et seq*.; and (5) service mark infringement under Georgia law, Ga. Code Ann. § 10-1-450. *Id*. at 5-10, ¶¶ 31-73. On September 12, 2018, plaintiffs filed a motion for a preliminary injunction on their federal false association claim. Docket No. 7. The Court held an evidentiary hearing on the preliminary injunction motion on November 27,

2018. Docket No. 38. The Court heard testimony from the following witnesses: (1) Todd Olson, former senior director for professional services at Verio, Inc.; (2) plaintiff Erik M. Underwood; (3) Dr. Deborah Jay, principal of Jay Survey Strategics; and (4) Theresa Payton, chief executive officer at Fortalice Solutions. *Id.*

## II. FINDINGS OF FACT

The Court makes the following findings of fact based on the parties' filings and the evidence presented at the November 27, 2018 evidentiary hearing.

Plaintiff My24HourNews.com is a media technology company based in Colorado. Docket No. 1 at 2, ¶ 10. Plaintiff Erik M. Underwood is the creator and president of My24HourNews.com. *Id.*; Docket 17-1 at 1, ¶ 1. Mr. Underwood testified that, beginning in about 2006, he developed an idea to present news to the public in forty seconds or less as part of a smart phone or tablet application. As part of that idea, Mr. Underwood purchased the domain name "My24HourNews.com" in 2008 and developed a business plan in approximately mid-2010. Exh. 24.

Another part of Mr. Underwood's idea was E.R.I.C.A. (Electronic Repetitious Informational Clone Application). Mr. Underwood conceived of E.R.I.C.A. as a "fully interactive" virtual news anchor who would "give customizable, regional news" as part of My24HourNews.com. *Id*. at 12. In his business plan for My24HourNews.com, Mr. Underwood stated that E.R.I.C.A. "will talk, speak, and have a personality; and the user can customize the news that she reports." *Id*. Mr. Underwood further described E.R.I.C.A. as "fully interactive," "a type of artificial intelligence," and "ultimately a soul without a body." *Id*. In October 2010, Mr. Underwood filed a Georgia trademark

2

registration application for "E.R.I.C.A. (Electronic Repititious Informational Clone Application)." Exh. M.[1]  On the application, Mr. Underwood described E.R.I.C.A. as "a multi national computer animated woman that has slanted blue eyes and full lips." *Id*. Mr. Underwood stated that the E.R.I.C.A. service mark was being used in connection with "verbally tell[ing] the news and current events through cell phone[s] and computer applications." *Id*.  Mr. Underwood attached an image of E.R.I.C.A., a computer-animated female head, to the trademark application.  *Id*.

In spring 2011, plaintiffs began to work with Verio, Inc., to build out their broadcast platform.  Docket 17-2 at 2, ¶ 6.  Verio is a provider of online business solutions.  *Id*. at 1, ¶ 5.  At the time, Verio was acting as a subcontractor for AT&T for web-based services.  *Id*.  Todd Olson, who was Verio's senior director of professional services at the time, testified that he worked with plaintiffs to develop My24HourNews.com and E.R.I.C.A.

On May 31 and June 1, 2012, plaintiffs met with AT&T representatives in Atlanta, Georgia with the intent of securing investment funds to launch My24HourNews.com and E.R.I.C.A.  Docket 17-2 at 5-6 (meeting agenda).  Mr. Olson and Mr. Underwood testified that they presented a "demo" of E.R.I.C.A. at this meeting.  At the evidentiary hearing, the Court viewed this demo, which consists of a Powerpoint slide deck that runs for about 45 seconds.[2]  The slide first shows a wire-frame image of a person. Next, the image of E.R.I.C.A. from the Georgia trademark registration enters the screen

---

[1] Both the application and the certificate of registration use this incorrect spelling of the word "repetitious."

[2] A static version of this slide can be found in Exh. 25 at 24.

and settles on top of the wire-frame image. This image does not move and is not animated. Finally, a text bubble appears next to the image of the woman. The text bubble reads:

> Hello My Name Is E.R.I.C.A., Welcome To My24HourNews.Com. I Can Offer You Varied News and Current Events of Your Region Or Country. In Addition, Specify Your Particular Interests, Such As, International Events, Political News, Financial World Markets, Weather, Sports, Or Entertainment.

There is no sound associated with the slide. The meeting concluded without a clear resolution.[3] Plaintiffs showed this E.R.I.C.A. demo to several other people during development. Docket No. 17-3, 17-4, 17-5.[4] The My24HourNews.com project stalled, and plaintiffs do not currently use E.R.I.C.A. in association with that site.

---

[3] In his declaration, Mr. Olson states that "[a] joint venture arrangement was agreed to between AT&T and My24" at the meeting. Docket No. 17-2 at 3, ¶ 11. At the hearing, Mr. Olson testified that, to his knowledge, Mr. Underwood and AT&T did not go forward with any such venture. While Mr. Underwood acknowledged at the hearing that My24 never launched, he alleges that AT&T agreed to a joint venture during the 2012 meeting. He is currently pursuing litigation against AT&T in the Northern District of Georgia. *See My24HourNews.com, Inc. v. AT&T Corp.*, No. 18-cv-01647 (N.D. Ga.) (seeking damages of at least $1.875 billion).

[4] Plaintiffs offer the Declarations of James B. Clark and Patricia Clark-Stauffer, who state that they viewed the E.R.I.C.A. demo in late 2009. Docket No. 17-4 and 17-5. Both Mr. Clark and Ms. Clark-Stauffer describe the E.R.I.C.A. demo as "very impressive" and incomparable to anything else that existed in 2009. Docket No. 17-4 at 3, ¶ 10; Docket No. 17-5 at 2-3, ¶ 11. The Court assigns these declarations little weight. Mr. Clark was, at one time, Mr. Underwood's legal guardian, and Ms. Clark-Stauffer is Mr. Clark's sister. Docket No. 17-4 at 2, ¶ 5; Docket No. 17-5 at 1, ¶ 4. Having viewed the demo, the Court concludes that a reasonable viewer would not agree with Mr. Clark's and Ms. Clark-Stauffer's descriptions of the demo, which is a presentation that any person familiar with Powerpoint could put together.

At some point before March 2015, Mr. Underwood acquired the domain name "My24Erica.com."[5] The website currently operates as a searchable movie database. Exh. 3. Mr. Underwood testified that he pays a licensing fee to a company called CodeCanyon for the right to post the code for a movie database called The Movie Database on My24Erica.com. Mr. Underwood testified that users are able to create an account on the site to bookmark their favorite movies. Plaintiffs did not establish how many users the site has or how much web traffic the site receives.[6] Further, plaintiffs did not establish that My24Erica.com generates revenue.[7]

Mr. Underwood testified that a "first-generation" version of E.R.I.C.A. functions on My24Erica.com. The home page of the website features the image of E.R.I.C.A.

---

[5] While Mr. Underwood testified that he put content on My24Erica.com beginning on March 18, 2015, Theresa Payton testified that her firm conducted a forensic investigation that concluded that no content appeared on My24Erica.com until July 2, 2018. *Compare* Docket No. 17-1 at 1, ¶¶ 2-4, *and* Exh. 3 at 1, *with* Docket No. 16-14 (Declaration of Landon Stewart); *see also* Docket No. 16-11 & 16-13 (describing a second forensic investigation by Marksmen Brand Protection Services). The Court need not resolve this evidentiary dispute to rule on plaintiffs' motion for a preliminary injunction.

[6] Plaintiffs offered screenshots of a sample of people who have liked the Facebook page for My24HourNews.com. Exh. 12 at 3-6. As there is no evidence connecting these likes to E.R.I.C.A. or My24Erica.com, the Court assigns this evidence minimal weight.

[7] Plaintiffs submit three declarations stating that Mr. Underwood has used E.R.I.C.A. on My24Erica.com "with regard to . . . financial news" since 2015. Docket No. 17-3 at 1, ¶ 4; Docket No. 17-4 at 3, ¶ 12; Docket No. 17-5 at 3, ¶ 13. However, the screenshots of the website and testimony at the hearing do not support the idea that My24Erica.com provides financial news, now or in the past. Separately, Mr. Underwood testified that users can, if they wish to stream or purchase a movie, click a button and be redirected to a third-party vendor to complete the transaction. However, there was no testimony about revenues generated by this activity flowing to My24Erica.com.

5

included in the Georgia trademark registration.  *Id*.  The website includes a page called "About ERICA" with the same image.  Exh. 12.  Mr. Underwood testified that currently E.R.I.C.A. functions as a base-level artificial intelligence personal assistant that can offer suggestions of her favorite movies.  The Court assigns little weight to Mr. Underwood's testimony on this point.  Plaintiffs offered no other evidence demonstrating that E.R.I.C.A. functions as Mr. Underwood described, such as screenshots or demonstrations showing that kind of functionality.  The content on My24Erica.com is licensed from CodeCanyon, and plaintiffs have not described precisely what E.R.I.C.A. does with that content.  Further, it is unclear to the Court how users would associate the search function on the site with "E.R.I.C.A."  The search bar is beneath the image of E.R.I.C.A., but without any text connecting the image to the name "E.R.I.C.A.," and there are no words near the search bar that indicate that "E.R.I.C.A." is performing the search.  Exh. 3.  There does not appear to be a link allowing a user to access the "About ERICA" page from the My24Erica.com home page.  *Id*.

In early 2016, defendant began developing a virtual financial assistant.  Docket No. 16-12 at 2, ¶ 4.  Defendant's program is named "ERICA."  Defendant unveiled the ERICA idea and name on October 24, 2016.  *Id*.  The trademark registration indicates that defendant began to use the ERICA mark in commerce on March 7, 2018.  Docket No. 16-7.  Defendant's customers can use the program to conduct basic banking activity, such as viewing their account balances and transferring money.  Docket No. 16-12 at 2-3, ¶ 7.  In September 2016, defendant engaged Randel Springer, an attorney who specializes in trademark law, to conduct a trademark clearance search.

Docket No. 16-6. Mr. Springer's investigation did identify plaintiffs' E.R.I.C.A. mark. *Id*. at 3, ¶ 7. Mr. Springer was unable to find any evidence that plaintiffs' mark was in use. *Id*. at 4, ¶ 10. Defendant filed an application to register ERICA with the U.S. Patent and Trademark Office (USPTO) on October 23, 2016. *Id*. at 7, ¶ 20. As no one filed any opposition to the ERICA application, the USPTO registered the ERICA mark on July 31, 2018. Docket No. 16-7.

On May 31, 2018, plaintiffs sent a cease-and-desist letter through counsel to defendant. Docket No. 1-9. The letter asserted that My24HourNews.com held common law and Georgia trademark rights in E.R.I.C.A. and that defendant's use of ERICA in connection with its virtual banking assistant infringed those rights. *Id*. On September 1, 2018, Mr. Underwood filed a federal trademark application with the USPTO for "ERICA" (without periods). Exh. S. In his application, Mr. Underwood claimed that he had been using the ERICA mark for banking and financial services, among other uses, since March 2010. *Id*. At the hearing, Mr. Underwood testified that this was incorrect and that he had made mistakes in his USPTO filing.

## III. LEGAL STANDARD

To succeed on a motion for a preliminary injunction, the moving party must show (1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 US. 7, 20 (2008)); *Little v. Jones*, 607 F.3d 1245, 1251 (10th

Cir. 2010)). "[B]ecause a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *Beltronics USA, Inc. v. Midwest Inventory Distribution, LLC*, 562 F.3d 1067, 1070 (10th Cir. 2009) (quoting *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003)) (internal quotation marks omitted). Granting such "drastic relief," *United States ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.,* 883 F.2d 886, 888-89 (10th Cir. 1989), is the "exception rather than the rule." *GTE Corp. v. Williams*, 731 F.2d 676, 678 (10th Cir. 1984).[8]

## IV. ANALYSIS

Plaintiffs request that this court enter a preliminary injunction "requiring the [d]efendant to cease use of the ERICA service mark." Docket No. 7 at 12.

In determining whether plaintiffs are entitled to a preliminary injunction, the Court begins by analyzing whether plaintiffs have shown a likelihood of irreparable harm. *See First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (noting that, "because a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction, the moving party must first demonstrate that such injury is likely before the other requirements will be considered" (internal quotation marks omitted)). Because "[t]he purpose of a preliminary injunction is not to remedy past harm," *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1267 (10th Cir.

---

[8] At the evidentiary hearing, defendant suggested that the injunction sought by plaintiffs is a "disfavored injunction." *See O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 977 (10th Cir. 2004) (en banc) (identifying the three types of disfavored injunctions). However, the Court need not reach this issue because plaintiffs have not met their burden under the standard applicable to any request for injunctive relief.

2005), the irreparable harm inquiry focuses on whether the plaintiffs have demonstrated a "significant risk" that they will suffer irreparable injury before a court can render a final decision on the merits of the case. *See id.*; *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1258 (10th Cir. 2003). "To constitute irreparable harm, an injury must be certain, great, actual and not theoretical." *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

Plaintiffs argue that they have shown irreparable harm because "irreparable injury is ordinarily presumed once the plaintiff has established a likelihood of confusion." *See* Docket No. 7 at 10 (citing *Big O Tires, Inc. v. Bigfoot 4X4, Inc.*, 167 F. Supp. 2d 1216, 1227 (D. Colo. 2001)). Defendant, in response, argues that the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), called into doubt the continued validity of a presumption of irreparable harm in intellectual property cases. *See* Docket No. 16 at 13-14 n.5. In *eBay*, a patent infringement lawsuit, the Supreme Court vacated the grant of a permanent injunction, holding that neither the district court nor the court of appeals had fairly applied traditional principles of equity in resolving the plaintiff's motion for injunctive relief. 547 U.S. at 393-94. The Supreme Court stated that traditional principles of equity require a plaintiff to show four factors before a court may grant permanent injunctive relief:

> (1) that [the plaintiff] has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

9

*Id.* at 391. Rather than address these factors, however, the U.S. Court of Appeals for the Federal Circuit had "articulated a 'general rule,' unique to patent disputes, 'that a permanent injunction will issue once infringement and validity have been adjudged.'" *Id.* at 393-94. The Supreme Court rejected the court's "categorical grant" of relief, reasoning that "a major departure from the long tradition of equity practice should not be lightly implied" and that "[n]othing in the Patent Act indicates that Congress intended such a departure." *Id.* at 391-92 (internal quotation marks omitted).

Although the Tenth Circuit has not addressed whether *eBay* abrogates the presumption of irreparable harm applied in trademark infringement cases, *see Lorillard Tobacco Co. v. Engida*, 213 F. App'x 654, 657 (10th Cir. 2007) (unpublished) (declining to consider "how *eBay* may apply" in the trademark infringement context), the two circuits to consider the issue have concluded that the rationale of *eBay* does carry over to trademark cases. Relying on *eBay* and *Winter*, the Ninth Circuit in *Herb Reed Enterprises, LLC v. Florida Entm't Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013), held that a "plaintiff must establish irreparable harm" to obtain a "preliminary injunction in a trademark infringement case." *Id.* at 1249. In reaching that holding, the court determined that the principles announced in *eBay* apply equally to the trademark infringement context because, "[j]ust as '[n]othing in the Patent Act indicates that Congress intended [a departure from traditional equitable principles],' so too nothing in the Lanham Act indicates that Congress intended a departure for trademark infringement cases." *Id.* (quoting *eBay*, 547 U.S. at 391-92). The court further reasoned that the Supreme Court's holding in *Winter* – that a plaintiff must show a

likelihood, rather than a mere possibility, of irreparable harm to obtain injunctive relief – reinforced a conclusion that courts may not presume irreparable harm when resolving preliminary injunction motions in trademark infringement cases. *Id.*

Applying similar reasoning, the Third Circuit in *Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205 (3d Cir. 2014), held that *eBay*'s rationale applies to trademark infringement actions brought under the Lanham Act. *Id.* at 214. In doing so, the court rejected the plaintiff's argument that *eBay* should not be extended to the trademark context due to the differences between Lanham Act and patent claims. *Id.* at 215. The court reasoned that any differences were immaterial because "[t]he rationale of the *eBay* decision was not that patent cases are somehow unique, but rather . . . that the decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, and that such discretion must be exercised consistent with traditional principles of equity." *Id.* (internal quotation marks omitted).

The Court finds the logic of these cases persuasive. Although plaintiff argues that *eBay* did not change the standard for irreparable harm in trademark cases, the Court agrees with the Third Circuit that the Supreme Court's decision in *eBay* was not predicated on the unique nature of patent cases, but on the principle that courts may not depart from "the long tradition of equity practice" absent a clear congressional mandate to do so. *Id.* at 216 (quoting *eBay Inc.*, 547 U.S. at 391-92); *see also Salinger v. Colting*, 607 F.3d 68, 77-78 (2d Cir. 2010) ("[N]othing in the text or the logic of *eBay* suggests that its rule is limited to patent cases. On the contrary, *eBay* strongly indicates that the traditional principles of equity it employed are the presumptive

11

standard for injunctions in any context."). As the Ninth Circuit reasoned in *Herb Reed*, nothing in the Lanham Act indicates that Congress intended for courts to depart from traditional principles of equity in trademark cases. *See Herb Reed Enters.*, 736 F.3d at 1249. To the contrary, the Lanham Act's provision concerning injunctive relief states that "[t]he several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions, *according to the principles of equity* and upon such terms as the court may deem reasonable." 15 U.S.C. § 1116(a) (emphasis added). The Court joins other courts in this district in finding that *eBay* abrogated the presumption of irreparable harm traditionally applied in trademark infringement cases. *See, e.g.*, *Foundation Learning LLC v. Academic, Arts & Action Charter Academy*, No. 17-cv-03182-RM-KLM, 2018 WL 3382933, at *2 (D. Colo. May 18, 2018) (finding, based on *eBay* and Tenth Circuit's recent decision in *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136 (10th Cir. 2017), that a plaintiff "is required to show irreparable harm" to obtain preliminary injunctive relief in a trademark action); *Tony's Taps, LLC v. PS Enters., Inc.*, No. 08-cv-01119-MSK-KLM, 2012 WL 1059956, at *4-5 (D. Colo. Mar. 29, 2012) (noting that *eBay* "calls into doubt the reflexive imposition of a permanent injunction, simply because [trademark] infringement has occurred," and finding that "the better course of action is to avoid imposition of a prospective injunction based solely on 'presumptions' and instead to examine whether the circumstances of the case indicate a likelihood of future irreparable injury"); *Greenway Univ., Inc. v. Greenway of Ariz., L.L.C.*, No. 11-cv-01055-CMA-KLM, 2011 WL 2669174, at *6 (D. Colo. July 7, 2011) (citing *eBay* in support of court's decision not to apply a presumption

of irreparable harm in a trademark lawsuit regardless of whether plaintiff had shown a likelihood of success on the merits); *see also JEG Powersports, LLC v. M & N Dealership VI, LLC*, 2017 WL 3976296, at *3 (W.D. Okla. Sept. 8, 2017) (noting that the "general consensus among the courts that have addressed the issue is that the *eBay* analysis extends to trademark/tradename cases" and that, if those cases are correct, "plaintiff must do more than merely demonstrate that its tradename has been infringed to establish irreparable injury"); *Red Robin Int'l, Inc. v. Lehigh Valley Restaurant Grp., Inc.*, No. 15-cv-02602-REB, 2016 WL 705988, at *4 n.3 (D. Colo. Feb. 23, 2016) (noting that "the presumption alone may not be sufficient to show irreparable harm" in light of the Supreme Court's decision in *eBay*).

Plaintiffs contend that, even without applying a presumption, they have demonstrated irreparable harm. At the evidentiary hearing, plaintiffs argued that they would suffer loss of goodwill if defendant were allowed to continue its use of the ERICA mark. Plaintiffs define goodwill as "sweat equity" – the work that Mr. Underwood put into developing E.R.I.C.A. over the last nine years. However, plaintiffs' conception of goodwill as "sweat equity" finds no support in the case law. Rather, goodwill is "an intangible asset that denotes the *business value* of a company's brand and reputation." *See* J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 2:19 (5th Ed.) (emphasis added). In other words, goodwill is a measure of how the public views a mark, not how the mark's owner views the mark. *See, e.g., Western Diversified Servs., Inc. v. Hyundai Motor America,* Inc., 427 F.3d 1269, 1274-75 (10th Cir. 2005) (discussing goodwill interchangeably with "reputation" of the trademark holder); *Marks*

*Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 335 (S.D.N.Y. 2011) (discussing loss of goodwill as "loss of a relationship with a client"). Therefore, the Court rejects plaintiffs' argument that irreparable harm can be demonstrated through a loss of "sweat equity."

The Court finds that plaintiffs failed to offer sufficient evidence establishing what loss of goodwill they would suffer if an injunction were not granted. As goodwill is a measure of how the public views a mark, plaintiffs must demonstrate that E.R.I.C.A. has goodwill in the public eye. *See Western Diversified Servs.*, 427 F.3d at 1274-75. Plaintiffs, however, did not introduce any evidence establishing that My24HourErica.com, which is the only active use of the E.R.I.C.A. mark, generates any revenue, has any web traffic, or has any users. The four declarations submitted by plaintiff that purport to show that the site has traffic are submitted by close friends or business colleagues of Mr. Underwood. Mr. Olson, for example, testified that he identifies himself on his LinkedIn page as a "Entrepreneur" at "My24HourNews.com." Similarly, it appears from her declaration that Irina Murrel was shown My24Erica.com as part of her personal relationship with Mr. Underwood, and that Mr. Clark and Ms. Clark-Stauffer have an almost-familial relationship with Mr. Underwood. *See* Docket 17-3 at 1-2, ¶¶ 3-7; *see also* this order at 4, n.4. Further, the Facebook "likes" introduced as evidence by plaintiffs demonstrate no connection to My24Erica.com or to the E.R.I.C.A. mark. *See* Exh. 12. Without evidence showing that plaintiffs have goodwill or customers to lose, the Court cannot find irreparable harm based on loss of goodwill. *See Greenway Univ.*, 2011 WL 2669174 at *6 (finding no irreparable harm where

plaintiff failed to show that the alleged trademark infringements were diverting customers away from plaintiff).

At the hearing, plaintiffs encouraged the Court to consider the factors outlined by the Tenth Circuit in *Dominion Video Satellite, Inc. v. Echostar Satellite Corp.*, 356 F.3d 1256, 1263 (10th Cir. 2004). In that case, the Tenth Circuit examined when courts have found irreparable harm from breaches of exclusivity provisions in a contract. *Id*. The court identified "inability to calculate damages, harm to goodwill, diminishment of competitive positions in marketplace, loss of employees' unique services, the impact of state law, and lost opportunities to distribute unique products" as factors that could support a finding of irreparable harm. *Id*. Assuming that these factors apply in the trademark infringement context, plaintiffs' evidence does not support any of them. As discussed, plaintiffs did not establish that denial of a preliminary injunction would diminish plaintiffs' competitive position in the marketplace because there is no evidence establishing what position they have in the marketplace. Similarly, denial of a preliminary injunction would not cause My24HourNews.com to lose Mr. Underwood's unique services. And the evidence before the Court does not indicate that, in their current form, E.R.I.C.A. or My24Erica.com are unique products. The content on My24Erica.com is entirely licensed from CodeCanyon, and E.R.I.C.A. is a basic search engine. As a result, the *Dominion* factors are of no help to plaintiffs' argument.

Finally, much of plaintiffs' claim of irreparable harm is based on Mr. Underwood's future plans for the E.R.I.C.A. mark. Mr. Underwood states that his plans to build out E.R.I.C.A., which he has at various times described as "an artificial intelligence mobile search engine" and "a soul without a body," are jeopardized by defendant's use of

15

ERICA in connection with a virtual banking assistant. See Docket No. 17-1 at 21; Exh. 24 at 12; see also Docket 17-4 at 3, ¶ 14 (stating that failure to grant an injunction will damage Mr. Underwood's "current and future branding plans for E.R.I.C.A.") (emphasis removed). Mr. Underwood also filed a trademark registration with the USPTO on September 1, 2018, claiming trademark rights in ERICA dating back to 2009 based on a multitude of uses such as "[d]ay and night vision systems" and "[g]aming software that generates or displays wager outcomes of gaming machines." See Exh. S. However, these planned uses are merely hypothetical today.[9] Plaintiffs failed to show that whatever uses they plan for E.R.I.C.A. in the future are any more than goals and, as such, the Court gives them very little weight in the determination of irreparable harm.

The Court concludes plaintiffs have not carried their burden of showing irreparable harm and therefore have failed to demonstrate that they are entitled to a preliminary injunction. As a result, the Court need not consider the remaining requirements for preliminary injunctive relief. See First W. Capital Mgmt. Co., 874 F.3d at 1143 (finding that the court did not need to address the remaining preliminary injunction factors where the plaintiff could not show irreparable harm).

## V. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that Plaintiff's Motion and Memorandum of Law Pursuant to Fed. R. Civ. P. 65 [Docket No. 7] is **DENIED**.

---

[9] While Mr. Underwood stated that allowing defendant's use of ERICA would dissuade any investor from meeting with him, plaintiffs offer no evidence of any plans to meet with investors regarding E.R.I.C.A. or My24HourNews.com.

16

DATED December 19, 2018.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge